## UNITED STATES v. TRAVIS.
### No. 5669.

Circuit Court of Appeals, Fourth Circuit.

Dec. 29, 1947.

John T. Casey, Atty., Department of Justice, of Washington, D. C. (Peyton Ford, Asst. Atty. Gen., Harry H. Holt, Jr., U. S. Atty., of Norfolk, Va., and J. Frank

Staley, Sp. Ass't. to Atty. Gen., on the brief), for appellant.

Roy L. Sykes and R. Arthur Jett, both of Norfolk, Va., for appellee.

Before PARKER and DOBIE, Circuit Judges, and COLEMAN, District Judge.

DOBIE, Circuit Judge.

O. T. Travis filed a libel in the United States District Court for the Eastern District of Virginia against the United States in which Travis sought damages for the stranding and sinking of his boat Dorothy Frances.

The District Court was given jurisdiction to hear this cause by virtue of Private Law 47, 57 Statute at Large, Part 2, Chap. 110, p. 666, under the provisions of which the United States of America had consented to be sued upon the cause of action here asserted, upon the same principles and measures of liability as in like cases in admiralty between private parties.

The District Court entered a decree holding the United States liable to Travis for the damages to the Dorothy Frances. From this decree the United States has appealed.

On February 21, 1937, the steel barge, U. S. No. 232, owned by Tar & Asphalt Transportation Company, Inc., of Baltimore, Maryland, sank in the Chesapeake Bay, south and east of Back River Beacon. On March 18, 1937, the owners of said Barge, U. S. No. 232, abandoned the barge to the United States and on the same day, the United States Lighthouse Service established a flashing light buoy near Barge, U. S. No. 232, for the purpose of marking the position of the wreck.

█ Under the title "Placement of markers over sunken crafts and other obstructions," 33 U.S.C.A. § 736, as amended August 16, 1937, reads: "Whenever the owner of any sunken vessel, boat, watercraft, raft, or other similar obstruction existing on any river, lake, harbor, sound, bay, or canal or other navigable waters of the United States has failed to mark, or in the judgment of the Commandant of the Coast Guard has failed suitably to mark, the same in accordance with the provisions of section 409 of this title, the Commandant

of the Coast Guard is authorized to suitably mark the same for the protection of navigation. Until such time as abandonment of any such obstruction has been established in accordance with the provisions of section 414 of this title, the owner thereof shall pay to the Commandant of the Coast Guard the cost of such marking. As soon as abandonment of any such obstruction has been so established, it shall be the duty of the Secretary of War to keep the same so marked pending removal thereof in accordance with the provisions of section 414 of this title, but the Commandant of the Coast Guard may at the request of the Department of War continue the suitable marking of any such obstruction for and on behalf of that Department. The cost of continuing any such marking shall be borne by the Department of War. All moneys received by the Commandant of the Coast Guard from the owners of obstructions, in accordance with the provisions of this section, shall be covered into the Treasury of the United States as miscellaneous receipts. No provision of this section shall be construed so as to relieve the owner of any such obstruction from the duty and responsibility suitably to mark the same in accordance with the provisions of section 409 of this title."

In the present case it is conceded that there was a legal abandonment of the wreck to the Government, which had assumed the obligation of properly marking the wreck. The obligation of the Government had thereby become exclusive. See New York Marine Co. v. Mulligan, 2 Cir., 31 F.2d 532; The Plymouth, 2 Cir., 225 F. 483.

The Dorothy Frances, at the time of her sinking, was a vessel, 65 feet long, 19 feet beam and 6 feet deep, equipped with a 45 h. p. semidiesel Fairbanks-Morse engine. On June 12, 1937, the Dorothy Frances, in command of her owner, Travis, left Sharpe's Wharf on the Rappahannock River with a cargo of oyster shells and followed a southerly course in the Chesapeake Bay. After she passed to the eastward of the buoy marking the entrance to Back River, Travis altered the course of the Dorothy Frances to south-southwest, so as to head in for Old Point.

While proceeding on this course, Travis observed, at a distance of from half a

mile to a mile off his port bow, a quick-flashing green buoy. Travis did not decrease his speed, which was between 6 and 7 knots an hour, but altered the course of the Dorothy Frances so as to pass the buoy on his port hand (to the west of the buoy) at an approximate distance of 350 feet. As a result, the Dorothy Frances stranded on the wreck of the completely submerged barge and sank.

The District Court held the Dorothy Frances free of any fault contributing to the accident and found that "the proximate cause of the accident was the improper marking of the wreck by the buoy." Thus the United States was held to be negligent, since the flashing buoy "was placed so far from said wreck that the buoy was likely to mislead a prudent navigator rather than properly indicate to him the position of said wreck."

The United States strenuously contends that the sinking of the Dorothy Frances was not due to any negligence of the United States in improperly marking the wreck of the barge, but was caused by the bad seamanship and navigation of Travis. We note and discuss briefly the bases for this contention.

The waters surrounding the wreck were marked on government charts as a fish weir area, which, the United States asserts, the Dorothy Frances should have avoided. This point was quickly disposed of by the District Court in holding (we think quite properly) that this had no causal connection with the accident. There was also evidence that, for some time prior to the accident, there had been little or no fishing in these particular waters.

Much is made by the United States of the failure of Travis to have on board the Dorothy Frances corrected navigational charts and notices to mariners. Travis testified that he had proper charts and there was evidence that the first government chart indicating the position of the wreck bore the date of June 12, 1937, the very day of the accident.

Several notices to mariners dealing with the position of the buoy and the wreck had been published by the United States Lighthouse Service. The latest of these, prior to the accident, bore date of May 27, 1937. We are unable to hold that experienced navigators of small boats, thoroughly familiar with the waters involved, must be held strictly accountable for the information contained in these notices. And there was testimony in the instant case that it was not the custom of such navigators to provide themselves with such notices.

There is ample evidence here to support the finding of the District Court: "Had libelant obtained and studied the pertinent notices to mariners, he would nevertheless have been justified in considering it safe to pass 350 feet to the westward of the buoy here in question." And, on May 27, 1937 (the day of the latest notice prior to the accident), the Log Book of the United States Lighthouse Service Buoy Tender Wisteria indicates that the buoy was moved to a point 65 feet farther from the wreck than the point indicated in the notice of May 27, 1937. These notices, too, indicated that the wreck lay north and south when, as a fact, at the time of the accident the wreck lay approximately east and west.

The District Court held that the Dorothy Frances was proceeding *from seaward* and therefore was properly navigated in passing the buoy on her port side. The government "Light List, Atlantic and Gulf Coast", page 8, prescribes: "In the case of buoys used to mark *obstructions,* middle-grounds and junctions of channels, white lights are used except when it is desired to indicate the side on which is should be passed, in which case *the light will be green when the preferred channel is to the right as approached from seaward."* (Italics ours.)

Before the buoy was sighted by Travis, he had changed his course to south-southwest so that he was headed for Old Point, only a few miles distant. The Dorothy Frances was, accordingly, proceeding from seaward.

In any aspect which this case may rationally assume, we must uphold the District Court's findings that no negligence, contributing to this accident, can be attributed to the Dorothy Frances in passing this buoy 350 feet on the port side and that the proximate cause of her sinking was the negligent and improper marking by the United States of the submerged wreck of the barge. See the Mary A. Bickel, 4 Cir., 1931, 46 F.2d 988.

The decree of the District Court is affirmed.

Affirmed.