The **CURTIS BAY TOWING COMPANY,**
Claimant-Respondent, Appellant,

v.

James **SADOWSKI,** as owner of **THE** Tug **MARECO,** Appellee.

No. 7409.

United States Court of Appeals Fourth Circuit.

Argued June 5, 1957.

Decided Aug. 1, 1957.

George W. P. Whip, Baltimore, Md. (Lord, Whip & Coughlan, Baltimore, Md., on the brief), for appellant.

John D. Alexander, Baltimore, Md. (Constable, Alexander & Daneker, Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOBELOFF, Circuit Judge.

The District Court, sitting as a court of admiralty, awarded full damages to the owner of a tug damaged in a collision, despite the undisputed fact that the operation of the tug was negligent. The court held that the negligence of the Mareco, the appellee's tug, did not contribute to the collision, and that the other vessel, the appellant's tug, the Gremlin, which was undamaged, was solely at fault.

The only question we are to decide is whether or not the negligence of the appellee's tug, the Mareco, contributed to the collision in which she alone was damaged, the fault of the other vessel in the collision, the Gremlin, owned by the appellant, Curtis Bay Towing Company, being admitted. If the Mareco too was at fault, her owner, Sadowski, is entitled, under settled principles of admiralty, to recover only one-half of the stipulated damages of $10,287.00.

The collision, which occurred in the Northwest Harbor at Baltimore on the night of January 8, 1956, was an aftermath of a towing operation of the Gremlin and a third tug, the Falk, also owned by the appellant, Curtis Bay Towing Company. The Falk was not a party to the collision, but figured largely in the events with which we are here concerned.

The Gremlin and the Falk had assisted a larger vessel, the Mission Carmel, from her berth in drydock at the Key Highway Shipyard. When the operation was completed, the Mission Carmel proceeded easterly and the Gremlin followed her downstream along her starboard side, waiting to pick up Captain Thomas, the Gremlin's captain, who had earlier gone aboard the Mission Carmel to direct the towing maneuvers. Unknown to those aboard the Gremlin, however, her captain had already departed the Mission Carmel and boarded the Falk.

The Falk proceeded downstream a short distance, cut off her engines, and lay facing approximately east, waiting for the Gremlin to pick up Captain Thomas. When the Gremlin, still following the Mission Carmel, was notified that the captain was aboard the Falk, she turned around and, as the District Court found, proceeded across the harbor, at

about three knots, in a northwesterly direction toward the Falk, approximately eight hundred feet away.

The Mareco, meanwhile, was already approaching the Falk from the east, at a distance from the Falk about twice that between the Gremlin and the Falk. Upon seeing the Falk, the Mareco varied to a southwest course so as to cross the Falk's bow, deciding that the Falk lay too close to the piers to chance crossing under her stern. No doubt the Mareco could not have seen the Gremlin until the latter parted company with the Mission Carmel, for the Mareco was to the north of the Mission Carmel, while the Gremlin was alongside to the south. However, as the two proceeded toward their eventual point of impact near the Falk, the Gremlin traveling a northwesterly course and the Mareco to her starboard on a southwesterly course, they were in full view of each other. It is not disputed that the running lights of both were burning. However, as neither looked, neither saw the other until the last instant, and the collision occurred a short distance beyond the point where the Mareco had crossed the bow of the Falk. Shortly before the impact, the Falk, becoming aware of what was about to happen, threw her searchlight alternately in front of each of the approaching vessels, but it was to no avail. When the Gremlin finally saw the Mareco, the Gremlin went full speed astern. The Mareco, still unaware, continued on course, maintaining her speed, until the owner's son, Sadowski, Jr., who was alone aboard, saw the Gremlin's bow through his stern window and gave his vessel a hard left rudder and full speed ahead in an attempt to avert impact. It was, however, too late, and the bow of the Gremlin struck the Mareco on her port quarter.

Little need be said of the negligence of the Gremlin. Due to her neglectful eye, she failed to accord to the Mareco the privilege owed to the vessel upon her starboard side. The issue, however, is whether the Mareco, by likewise failing to look, was contributorily at fault. Two circumstances, taken together, are said to prevent a conclusion that her fault contributed to the collision. These turn upon two separate applications of the starboard hand rule, first as between the Mareco and the Gremlin, and second as between the Mareco and the Falk.

It is argued that as the Mareco was privileged over the Gremlin, she was bound to maintain her course and speed, so that any attempt by the Gremlin, the burdened vessel, to accord to the Mareco the privilege of crossing first would not be thwarted. Additionally, it is said that the failure of the Mareco to see the Gremlin until too late was mitigated by the fact that as the Falk lay to the starboard of the Mareco, the latter, being the burdened vessel, was bound to watch the Falk closely. And, of course, the syllogism concludes that the Mareco was not, therefore, contributorily at fault.

While this line of reasoning is not without some appeal, we find ourselves in disagreement, for it draws a legal conclusion not warranted by the practicalities of the situation in which these vessels found themselves.

■■ It can hardly be doubted that the starboard hand rule does not command or entitle the privileged vessel completely to ignore dangers that may arise upon her port side, on the theory that she will be privileged over whatever may there be present. It is, of course, true that as the privileged vessel, she is ordinarily bound to maintain her course and speed until a collision is imminent, as this court has many times held, and the courts will not ordinarily hold the privileged vessel liable for a collision if the navigator, when confronted by sudden danger, decides to hold his course and speed, although it may be shown by subsequent investigation that he could have chosen a more prudent course. See The Piankatank, 4 Cir., 87 F.2d 806; Pacific-Atlantic Steamship Co. v. U. S., 4 Cir., 175 F.2d 632. The rule, however, is not to be followed blindly without due regard to common sense, and it is, therefore, no less true that the duty to persist in her course and speed is not absolute

when a crisis has arisen and collision is imminent. As was observed in The Gulfstar, 3 Cir., 136 F.2d 461, 465: "It is because they respect the choice made by the navigator of a privileged vessel in extremis and not because they insist upon slavish adherence to the course and speed rule that the courts have at times upheld the action of such a navigator in maintaining his course and speed into collision. See Wilson v. Pacific Mail S. S. Co., 1928, 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651." Here, the navigator, having precluded the exercise of any judgment, may not claim the tolerance due one who in the stress of emergency makes a faulty choice.

The qualification to the course and speed rule has not gone unnoticed in this court. Judge Soper, in Campania De Navegacion Cebaco, S. A. v. The Steel Flyer, 4 Cir., 200 F.2d 643, 645–646, pointed out that, while to avoid confusion upon the sea, the privileged vessel will be required to maintain her course and speed, "no vessel has a right of way into a collision, and Articles 27 and 29 of the Inland Rules, 33 U.S.C.A. §§ 212, 221, expressly provide that in obeying the rules, due regard shall be had to all dangers of navigation and collision, and to any special circumstances which render a departure therefrom necessary to avoid immediate danger, and nothing in the rules will exonerate any vessel for the neglect of any precaution which may be required by the special circumstances of the case."

■ We are of the opinion that it must necessarily follow that a vessel, though she be privileged, must, through the maintenance of a proper lookout, preserve for herself the ultimate opportunity of escaping her predicament and avoiding the disaster by the exercise of experienced nautical judgment, when it has become apparent that the burdened vessel will be unable to avoid the collision. The Salutation, 2 Cir., 79 F.2d 609, 611; The Osceola, 2 Cir., 239 F. 857; Delaware, L. & W. R. Co. v. Central R. Co. of New Jersey, 2 Cir., 238 F. 560;

The Mauch Chunk, 2 Cir., 154 F. 182; The Devonian, D.C.Mass., 110 F. 588.

Recognition was given to this interpretation of the law in The Devonian, supra, where it was said, 110 F. at page 592: "* * * the privileged vessel has no right to keep her course with her eyes shut. The rule requiring a lookout is imposed alike upon the burdened and privileged vessel. The duty of the privileged vessel is to hold her course; the duty of the burdened vessel is to keep off that course. But the privileged vessel is to hold her course, constantly observing the burdened vessel, in order to notice if the latter fails in her duty."

A very similar concept of the duty resting upon the privileged vessel in such circumstances is expressed in the following passage from Delaware, L. & W. R. Co. v. Central R. Co. of New Jersey, et al., supra, 238 F. at page 562: "At all events, a navigator may not blindfold his eyes, and then say, after collision, that although he did not see her at all, the fault under the rules was with the other vessel. The fundamental rule of the admiralty is that a vigilant lookout must be kept on all vessels, so that collision may be prevented even with those which are violating the rules."

■ As the District Court found, the Mareco failed to see the Gremlin "until they were too close to avoid a collision," and in this respect we think she was contributorily at fault. By failing to watch to port, Sadowski deprived himself of whatever opportunity he would otherwise have had to avoid the impact when the danger became both present and clear.

That the Mareco was the burdened vessel with respect to the Falk did not absolve Sadowski, the Mareco's navigator, of his duty to observe the Gremlin. Bound though he was to watch the Falk and accord her the starboard privilege if necessary, he could not fix his gaze so steadfastly and exclusively upon the barely moving Falk as to become and remain oblivious of moving vessels upon his port side, even though as a technical matter,

the Mareco would have been privileged over such vessels. Had Sadowski by a more alert use of his faculties, seen the Gremlin, he would have realized from an appraisal of the full situation that the Gremlin demanded his attention as much as, if not more than, the all but motionless Falk. Just as the Falk became aware of the imminence of collision between the Gremlin and the Mareco, and flashed alternate signals to the two vessels the Mareco's navigator, if he were looking, would have seen the situation as readily.

Since in our view the Mareco's negligence contributed to the collision, the decree will be modified to provide for the usual equal division of the damages.

Modified and remanded.